Ronnie WEIL, et al., Plaintiffs,

v.

THE LONG ISLAND SAVINGS BANK,
FSB, et al., Defendants.

No. 94–CV–1292(TCP)(WDW).

United States District Court,
E.D. New York.

May 7, 2001.

John B. Amrod, Amrod & Ricci, Garden City, NY, for plaintiffs.

Louis Aloysius Jr. Craco, Jr., Davis Weber & Edwards, P.C., New York City, for Ronnie Weil.

Russel E. Brooks, Milbank, Tweed, Hadley, McCloy, New York City, for Long Island Savings Bank, FSB, John J. Conefry, Jr., William E. Viklund, Lawrence W. Peters, Bruce M. Barnet, Troy J. Baydala, Clarence M. Buxton, Edwin M. Canuso, Richard F. Chapdelaine, Brian J. Conway, Robert J. Conway, Frederick de Matteis, George R. Irvin, Robert S. Swanson, James B. Tormey, Leo J. Waters, Seth H. Waugh, Donald D. Wenk, Astoria Financial Corp., Astoria Federal Savings and Loan, Denise Whelan, Delores G. Conway.

Paul F. Corcoran, Davis & Gilbert, New York City, for Conway & Ryan, P.C., Power, Meehan & Petrelli, P.C., Power, Meehan & Power, P.C., James J. Conway, Jr., James J. Power, Pierce J. Power, Robert F. Meehan.

Thomas P. Puccio, New York City, for James J. Conway, Jr., James J. Conway, III.

Joel Cohen, Stroock & Stroock & Lavan, LLP, New York City, for Susan Conway Petrelli.

## MEMORANDUM AND ORDER

PLATT, Senior District Judge.

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the plaintiffs seek to certify a class. For the following reasons, this motion is granted.

## BACKGROUND

The putative class representatives, Plaintiffs Ronnie Weil, Steven S. Paradise, Jane K. Paradise, Louis Versacio, Anna Marie Versacio, Terence Mooney, Ann Mooney, and Kathleen Canavan,[1] obtained residential loans from Defendant Long Island Savings Bank FSB ("LISB") during the period January 1, 1983 to December 31, 1992.

The Second Amended Complaint provides that as part of the mortgage agreements, plaintiffs received standard form documents which notified them that they were required to pay for LISB's legal fees for the processing and closing of loans. These legal fees were paid to the law firms of Power, Meehan & Petrelli, P.C. and Power, Meehan & Power, P.C., which were successors in inter-

---

1. Plaintiffs indicate that David and Linda Pilossof and John and Maureen McLaughlin asked to be relieved as class representatives.

est to Conway & Ryan, P.C., the former law firm of LISB's Chief Executive Officer, James J. Conway, Jr. Plaintiffs maintain that the legal fees they were required to pay were excessive and were used, in part, to fund kickbacks to Conway and his family. The "kickbacks" were in effect a payment for Conway's promise to use these law firms exclusively for LISB's work. Plaintiffs claim that Conway and his family received $11 million in illegal payments from this scheme, which was only stopped when the Office of Thrift Supervision ("OTS") banned Conway from banking for life.

On March 23, 1994, the plaintiffs brought this action, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, the Truth–In–Lending Act ("TILA"), 15 U.S.C. § 1638, the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607, common law fraud, violations of section 349 of the New York General Business Law, and negligent supervision.

On November 15, 1999, this Court denied in part and granted in part the defendants' motion to dismiss. Subsequently, the defendants rejected the plaintiffs' request to stipulate to class certification. Plaintiffs now move to certify a class of consumers who received mortgage loans from LISB and paid legal fees during the period between January 1, 1983 and December 31, 1992. As indicated in their reply papers, the plaintiffs agree to restrict the class to plaintiffs who paid legal fees to the law firm defendants.

## DISCUSSION

Rule 23(a) of the Federal Rules of Civil Procedure sets forth a four part test for certifying a class:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a)(1)-(4).

In addition, to certify a class in a suit for money damages, a court must find that

> questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3).

■ When applying Rule 23, courts should accept all allegations in the complaint as true. See *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993) (citing *Shelter Realty Corp. v. Allied Maint. Corp.*, 574 F.2d 656, 661 n. 15 (2d Cir.1978)). The plaintiffs must establish that the applicable requirements of Rule 23 are met. *In re Playmobil Antitrust Litig.*, 35 F.Supp.2d 231, 238 (E.D.N.Y.1998). However, the merits of the plaintiffs' claims should not be part of the inquiry as to whether class certification is warranted. *Maywalt*, 147 F.R.D. at 54. Although the requirements of Rule 23 are liberally construed, *In re Playmobil*, 35 F.Supp.2d at 239, a court should only certify a class if it "is satisfied, after a rigorous analysis" that the requirements of Rule 23 have been met. *Monaco v. Stone*, 187 F.R.D. 50, 59 (E.D.N.Y.1999) (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

### 1. Numerosity

■ To satisfy the requirement that the proposed class be "so numerous that joinder of all members is impracticable," Fed. R.Civ.P. 23, the plaintiffs are not required to provide the Court with the exact class size or the identity of the class members. *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir.1993). Nor are they required to show that joinder is impossible. *Id.*

■ When considering whether joinder is practicable, courts should look at factors such as "judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief

which would involve future class members."
*Id.* at 936.

The numerosity requirement is met here. This proposed class includes all individuals who received loans from LISB and paid LISB's attorneys fees between January 1, 1983 and December 31, 1992. Plaintiffs indicate that approximately 35,000 customers are eligible to join this class. The potentially large number of class members makes joinder practically impossible. Moreover, judicial economy is served because class certification will prevent the possibility that thousands of actions will be filed.

### 2. Questions of Law and Fact Common to the Class

■ A single common issue of law will satisfy the commonality requirement. *Monaco,* 187 F.R.D. at 61. A common issue of law will be found if plaintiffs "identify some unifying thread among the members' claims . . . ." *Id.* A court may find a common issue of law even though there exists "some factual variation among class members' specific grievances . . . ." *In re Playmobil,* 35 F.Supp.2d at 240.

Here, the plaintiffs allege that the class members raise several common issues of law. For example, the plaintiffs note that there are issues as to whether

(1) Defendants misrepresented and/or omitted material facts in the customer commitments, Federal Truth–In–Lending Disclosure Statements and Good Faith Estimates of Settlement Costs that each class member received in connection with his or her loan; (2) Defendants acted intentionally or recklessly; (3) the payments fraudulently received by Conway as a result of this scheme constitute illegal kickbacks under RESPA; (4) the disclosures in the standard forms violated TILA; (5) this scheme violated the Racketeer Influenced and Corrupt Organizations Act and constituted common law fraud; and (6) whether plaintiffs and the class were injured as a result.

(Pls.' Mem. Supp. Certify Class 9.) These common issues of law are sufficient to meet this requirement.

### 3. Typicality requirement

■ Plaintiffs' claims must be typical of the class. Fed.R.Civ.P. 23(a)(3). This requirement is satisfied if plaintiffs show that "the representative plaintiff's claims are based on the same legal theory and arise from the same practice or course of conduct as the other class members." *In re Playmobil,* 35 F.Supp.2d at 241.

Plaintiffs argue that all of the class representatives and the class members were victims of the same fraudulent scheme, as all members of the class were similarly injured when they were overcharged for legal fees.

■ Defendants argue that several of the putative class representatives are subject to "unique defenses" which make their claims atypical and threaten to distract the plaintiffs from the heart of the litigation. *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990). Although as a general matter, a court should not certify a class representative who is subject to unique defenses, the rule is not strictly followed in this Circuit. *Harrison v. Great Springwaters of Am., Inc.,* 96–CV–5110, 1997 WL 469996, at *3 (E.D.N.Y. June 18, 1997) (quoting *In re Frontier Ins. Group, Inc. Sec. Litig.,* 172 F.R.D. 31, 41 (E.D.N.Y.1997)). In this Circuit, "unique defenses" will not bar a representative from meeting the typicality requirement "even though that party may later be barred from recovery by a defense particular to him [or her] that would not impact other class members." *In re Frontier,* 172 F.R.D. at 41. (quoting *Langner v. Brown,* No. 95 CV 1981, 1996 WL 709757, at *3 (S.D.N.Y. Dec. 10, 1996)). However, unique defenses generally preclude a plaintiff from serving as a representative in cases where "the potential defenses dovetail with the merits of the class action." *Id.*

■ In this case, the defendants argue that Weil's claims are atypical of the class because she and her step-father-in-law, who is also the plaintiffs' counsel, John B. Amrod, allegedly engaged in a fraud on LISB.[2] Al-

---

2. The defendants claim that Weil and Amrod     engaged in the following alleged fraud. Amrod

legedly, Weil misrepresented her assets, her employment, and the existence of a credit-worthy cotenant when she applied for a mortgage with LISB.

As a practical matter, the unique defenses theory probably does not preclude Weil from serving as a class representative. First, the doctrine of unclean hands does not appear to constitute a defense to the action brought by Weil because, assuming that she took the actions alleged by the defendants, the conduct charged to the defendants is more egregious. *See Dunlop–McCullen v. Local 1–S, AFL–CIO–CLC,* 149 F.3d 85, 90 (2d Cir.1998) (construing the doctrine of unclean hands in an action brought under the Labor–Management Reporting and Disclosure Act and noting that the doctrine "may be relaxed if defendant has been guilty of misconduct that is more unconscionable than that committed by plaintiff.") (internal quotations and citation omitted). However, even if the doctrine of unclean hands were to be applied to Weil, she could still serve as a representative because her allegedly fraudulent actions do not lie at the heart of the merits of this case, the defendants' use of the attorneys fees collected from the plaintiffs, and therefore the defense does not dovetail with the merits of the class action.

■ Weil would also normally be permitted to serve as a representative despite concerns about her credibility. Although credibility factors into a determination of whether a class representative's claims are typical of the class, it is generally inappropriate to deny certification on this ground. *In re Frontier,* 172 F.R.D. at 41. Here, Weil's exposure to credibility attacks is minimal. As the plaintiffs note, Weil may not be called to testify because the plaintiffs allegedly have documentary evidence to show that Weil and the other plaintiffs paid the allegedly excessive attorneys fees and were victims of fraud. If Weil does testify, it is difficult to see how an extensive examination of her credibility would further the defendants' case, as the issue in this case, the defendants' use of the attorneys fees collected from the plaintiffs, is at best only peripherally related to Weil's conduct. Therefore, an examination of Weil's credibility should not distract her from the issues at hand.

■ Defendants also maintain that Kathleen O'Grady's claims are atypical because she took out a co-operative loan rather than a mortgage loan. This argument fails. Here, the putative class is primarily composed of people who obtained mortgage loans. The loan O'Grady took out differs from a mortgage loan because it is not secured by real property. However, variations in the form of the collateral will not negate the typicality of O'Grady's claim because the harm allegedly suffered by the putative class and the harm suffered by O'Grady is substantially similar. Like the rest of the class, O'Grady was allegedly defrauded in the same fashion by paying excessive attorneys fees. Additionally, O'Grady's claim is clearly typical of the claims of members of the putative class who took out co-operative loans. According to the defendants, fifteen percent of the borrowers during the class period took out co-operative loans.

The defendants' arguments that O'Grady's claim is atypical because she waived her right to trial by jury in her loan agreement also fail. The jury waiver in the agreement

allegedly needed to sell urgently his house in Syosset to satisfy a costly loan. Weil agreed to purchase the property, and Amrod offered Weil a $150,000 purchase money mortgage for ninety days. Weil, allegedly at Amrod's urging, attempted to refinance that loan with LISB. Because Weil was not eligible for a mortgage with LISB, Amrod's step-son, who was also Weil's boyfriend, convinced one of his co-workers, Robert DeLuca, to enter the transaction. DeLuca tendered $11,750 as a down payment for the property. DeLuca eventually decided that he wanted his down payment returned but agreed to be a "phantom purchaser" so that Weil would be able to obtain a mortgage loan from LISB. Ac-

cordingly, Weil and DeLuca submitted joint loan applications. Thirteen days after the loan was executed, DeLuca transferred completely his one-half interest to Weil for no consideration.

The defendants further allege that Weil's application for a loan contained several false statements. Weil allegedly stated falsely that she and DeLuca would be tenants in common. This statement was allegedly false because Weil knew that DeLuca would not participate in the transaction. Defendants also maintain that Weil misstated the amount of her down payment, information regarding her employment, and Weil's liability on a loan to Amrod.

only applies to a "lawsuit or proceeding which affects this agreement." (Epner Aff. Ex. 37 ¶ 33.) The plaintiffs correctly argue that the lawsuit here does not affect the agreement because it concerns collateral issues such as excessive legal fees.

Defendants' arguments that Steven and Jane Paradise's loans are atypical are also without merit. The Paradises took out two mortgage loans from LISB. The first mortgage, which the Paradises borrowed in 1987, was for $160,000. The second mortgage, taken out in 1991 for $176,000, was a refinancing of the first loan. The defendants claim that the Paradises' loans are atypical because the Paradises negotiated lower attorneys fees in the second mortgage agreement. However, because the Paradises paid the $750 in attorneys fees for their first mortgage, and because they claim that part of this amount was used to fund kickbacks, their claims are not atypical.

Additionally, the defendants argue that the claims of Louise and Anna Marie Versacio ("the Versacios") are atypical and that the Versacios are subject to unique defenses. They argue that the RESPA form given to the Versacios estimated that they would pay $750 in legal fees, but ultimately the Versacios were only charged $450 in legal fees. Additionally, they maintain that the Versacios obtained their mortgage in 1992 after Conway had resigned his position at the Bank and at the law firm and his family members had resigned their positions in the law firm.

First, the allegations in the Second Amended Complaint concerning the kickback scheme must be accepted as true at this point. The amount of legal fees paid by the Versacios is immaterial to a finding that, like the other plaintiffs, the Versacios paid fees which were used to fund kickbacks to Conway and his family. Moreover, the Second Amended Complaint provides that the alleged scheme continued through December 31, 1992, after the Versacios had taken out their loan. As such, the Versacios paid fees during the time period when the alleged scheme occurred. At this stage in the proceedings, this time frame must be accepted

as accurate, and therefore, the Versacios state claims which are typical of the class.

### 4. Adequacy of representation

■ To meet the burden of showing adequate representation, the plaintiffs must establish two elements. They must show that the chosen class representatives will fairly and adequately represent the interests of the remaining class members and that class counsel is "qualified, experienced, and generally able to conduct the litigation." *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) (quoting *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

■ There are several factors which a court may consider when deciding whether a plaintiff will adequately represent his class. A nonexclusive list includes the following: whether the representative's interests are antagonistic to the interests of the class members, *see Harrison*, 1997 WL 469996, at *6; whether the representative has a general understanding of the nature of the claims he is bringing such that he will not undermine the plaintiffs' case, *see id.;* whether he is free from "unique defenses" which might make him preoccupied about his own individual claim, *see Gary Plastic Packaging Corp.*, 903 F.2d at 180; and whether he has the ability to serve as a fiduciary on behalf of the class, *In re LILCO Sec. Litig.*, 111 F.R.D. 663, 672 (E.D.N.Y.1986).

#### a. Class Representatives

The defendants apparently argue that the following plaintiffs will not provide adequate representation to the class and therefore certification should be denied.

##### i. Ronnie Weil

The defendants object that Weil's credibility is undermined by the fraud she allegedly committed, which subjects her to "unique defenses." The defendants also object that Weil is married to the step-son of the plaintiffs' counsel and therefore is more interested in advancing her attorney's interests than those of the rest of the class. As discussed above, issues of Weil's credibility do not subject her to unique defenses. Similarly, these

concerns do not undermine her ability to function as a fiduciary because they do not implicate a central issue in the case and because they are not particularly severe. *Harrison*, 1997 WL 469996, at *7. Issues relating to credibility are particularly severe when they are "so substantial that they threaten to undermine the plaintiffs' case as a whole." *Id.*

While credibility questions, which are contested by the plaintiffs, should not legally preclude Weil from serving, they do raise unnecessary and collateral questions which may well divert or distract fact finders from the main issues in this case and possibly impair in part (or even in whole) from a recovery herein. Similarly, while Weil does not have an impermissible conflict of interest with other class members because of her relationship with Amrod, Weil's potential interest in the legal fees recovered by Amrod is yet another possible distraction and diversion. Given the other plaintiffs in this case, we see no reason to saddle them and the other class members with these problems. We therefore strongly urge the other plaintiffs to persuade the plaintiff Weil to agree to a severance of her part as a named class plaintiff in this case.

### ii. Kathleen O'Grady

Kathleen O'Grady should not be disqualified. The defendants argue that she is not an adequate representative because she took out a cooperative loan. As discussed above, the difference in the collateral of the loan is immaterial.

▬▬ The defendants also argue that O'Grady should not be a representative because she lacks the requisite level of knowledge of the factual matters of this case and because she allegedly destroyed documents regarding this case after she had been approached by the plaintiffs' counsel. A plaintiff will only be deemed inadequate if her lack of knowledge "call[s] the validity of the plaintiffs' entire case into question." *Harrison*, 1997 WL 469996, at *6.

In complex litigation matters, lack of knowledge rarely suffices to disqualify a representative because plaintiffs are only required to have a basic understanding of the

facts in the lawsuit as alleged in the complaint. *See In re Frontier*, 172 F.R.D. at 47. Courts have only denied certification based on the plaintiffs' lack of knowledge in cases where "the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." *Id.* (internal quotations and citations omitted).

According to the defendants, O'Grady failed to remember either specifics about her interactions with the defendants or the documents used during the closing. She merely relied on the facts told to her by her attorney. Additionally, O'Grady admittedly destroyed documents regarding the purchase of the apartment for which she had taken a cooperative loan from LISB. Finally, the defendants argue that most of O'Grady's claims are barred by the applicable statute of limitations and that she must show that the clock was equitably tolled. They allege that she cannot save her claims under the doctrine of fraudulent concealment because it was "common knowledge" that LISB's legal fees were higher than some other banks.

The defendants' arguments are not meritorious. First, the defendants fail to cite particular instances in the record presented here where O'Grady was confused or wrong about the background of this litigation, and there do not appear to be any instances where O'Grady seemed to lack a basic understanding of the facts of this matter. She therefore has sufficient factual knowledge to represent adequately the class. Defendants' contention that O'Grady destroyed documents does not warrant a finding that she is inadequate because it does not appear that her actions were done to thwart the outcome of her case. As explained by the plaintiffs, O'Grady was not a plaintiff in this case when she admittedly shredded documents. Although she had been in contact with the attorney for the plaintiffs several months before she shredded the documents, she had not heard back from him at the time she destroyed the documents. Her actions therefore do not undermine the claims of the class. Furthermore, by attending the deposition and noting her

desire to testify at trial, O'Grady has shown that she is willing to be a participant in this litigation. Moreover, the defendants' arguments concerning the statute of limitations, which are discussed further *infra*, implicate the merits of this action. She is an adequate representative of the class.

### iii. *Steven and Jane Paradise*

■ Defendants argue that Steven Paradise will not adequately represent the class because he sold malpractice insurance to Amrod's law firm and because he has an interest in continuing his sales to Amrod. Because there is no evidence here that Mr. Paradise will have any interest in legal fees which Amrod may eventually seek, there is no reason to find that Mr. Paradise should not serve as a representative. *See Fischer v. Int'l Tel. & Tel. Corp.*, 72 F.R.D. 170, 173–74 (E.D.N.Y.1976). Additionally, the defendants apparently argue that Steven and Jane Paradise must show that the statute of limitations has been equitably tolled here to represent adequately the class. A court should not conduct a preliminary inquiry into the merits of an action at the class certification stage. *Harrison*, 1997 WL 469996, at *2 (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). Even assuming that the plaintiffs were required to make this showing at this stage of the proceedings, this ground would not have merit: if the plaintiffs' claims were actually barred, they would still not have interests adverse to the interests of their class members.[3]

### iv. *Anna and Terence Mooney*

Certification should not be denied on the basis of Anna and Terence Mooney's adequacy. Both have demonstrated that they have sufficient knowledge of the underlying facts because both testified that the legal fees they paid were excessive in part because a percentage of the fees were used for kickbacks. Ms. Mooney testified that she would recover approximately $215 from this action because that was the amount that "would have been used ... as a kickback to the bank for

something ... personal use as opposed to real fees." (Sweeney Decl. Supp. Pls.' Reply Mem. of L. Ex. 1 at Anna Mooney Dep. 109.) Terence Mooney testified that part of the legal fees he paid was given to "the head of the bank" rather than the law firm performing the services. (*Id.* at Terence Mooney Dep. 51.)

Although Terence Mooney did not grasp the extent of his fiduciary duties as a class representative at the time of his deposition, he has since stated under oath that he will comply with his duty to serve the best interests of the class members. He is an adequate representative of the class.

### v. *Louis and Anna Marie Versacio*

The Versacios are adequate representatives. Defendants' argument that the claims of the Versacios are time-barred is discussed further *infra*.

### b. *Counsel*

■ Plaintiffs' lead counsel, Hogan & Hartson, L.L.P., is clearly qualified to represent adequately the class. The firm has 700 attorneys, and several attorneys in the firm's New York office have experience in RICO and class action litigation. Defendants maintain, however, that Amrod is not qualified to represent the class. They point out that Amrod has acknowledged that this is the only class action he has litigated in approximately twenty years. They further press that he participated in the fraud allegedly committed by Weil against LISB. They also argue that his testimony may be necessary here on the subject of his actions in relation to Weil's loan, and therefore, he is ethically precluded from proceeding in this matter under DR 5–102(d), which provides the following:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer or a lawyer in his or her firm may be called as a witness on a significant issue other than on behalf of the client, the lawyer may

---

**3.** The defendants have also used this statute of limitations argument with respect to the adequacy of Terence and Anna Mooney and Louis and Anna Marie Versacio. For the reasons stated above, this argument is rejected.

continue the representation until it is apparent that the testimony is or may be prejudicial to the client at which point the lawyer and the firm must withdraw from acting as an advocate before the tribunal. N.Y. Jud. L. DR 5–102 (McKinney 2000).

■ Despite these concerns, Amrod will adequately represent the plaintiffs. The defendants have not come forward with anything more than mere allegations regarding Amrod's alleged involvement in a fraud on LISB. Neither have they shown that any charges or disciplinary proceedings have been brought against Amrod. The record, at this point, does not bear evidence of any misconduct on Amrod's part. As for the defendants' argument that disqualification is required under DR 5–102(d), the defendants have failed to meet the high standard of proof required in this Circuit. *See Paramount Communications, Inc. v. Donaghy,* 858 F.Supp. 391, 394 (S.D.N.Y.1994) (noting that motions to disqualify counsel based on the advocate-witness rule are subject to strict scrutiny because of a great potential for abuse). They have not shown that Amrod's testimony is necessary or that his testimony would be substantially prejudicial. *Id.* at 394–95. In fact, if this evidence is offered merely to impeach Weil's credibility, it is not admissible. *See* Fed.R.Evid. 608(b) (the credibility of a witness may not be attacked by using extrinsic evidence of specific acts).

### 5. *Common Questions Predominate*

■ To acquire class certification, the plaintiffs must show that common questions will predominate in the action and that a class action is a superior method of handling the matter. Fed.R.Civ.P. 23(b)(3). An analysis of the predominance of individual claims "begins with the elements of the alleged claim for relief, and requires an examination of the proof required to substantiate plaintiffs' allegations." *Potchin v. Prudential Home Mortgage Co., Inc.,* No. 97–CV–525 (CBA), 1999 WL 1814612, at *9 (E.D.N.Y. Nov. 12, 1999) (quoting *In re Sumitomo Copper Litig.,* 182 F.R.D. 85, 89 (S.D.N.Y.1998)). The predominance standard will be satisfied "unless it is clear that individual issues will overwhelm the common questions to render

the class action valueless." *In re Playmobil,* 35 F.Supp.2d at 245.

■ Defendants maintain that individual issues will predominate in the RESPA action because all claims under RESPA require an analysis of whether a fee was unreasonable. Defendants rely heavily on *Potchin v. Prudential Home Mortgage Co., Inc.,* No. 97–CV–525, 1999 WL 1814612 (E.D.N.Y. Nov. 12, 1999). The plaintiffs in *Potchin* sought to certify a class in action in which they alleged that the defendant mortgage company violated RESPA and State law by paying referral fees to brokers. *Id.* at *1. These referral fees, known as "yield spread premiums," were allegedly paid by the defendant to brokers who referred customers who were willing to take out an above-market loan. *Id.* The defendants paid the yield spread premiums regardless of the actual services performed by the broker. *Id.* The *Potchin* court held that class certification was not appropriate because RESPA called for a determination of whether the fee was legitimized because it was reasonably related to lawful goods or services provided by the brokers. *Id.* at *6–*8. Under the facts presented in *Potchin,* individual issues would predominate because each plaintiff would have to provide evidence regarding the nature of the goods and services performed by the brokerage firm to show that these goods or services were not reasonably related to the yield spread premiums paid. *Id.* at *9. However, under the facts alleged here, *Potchin* may be distinguished. In this case, the plaintiffs claim that the kickback scheme is illegal *per se,* and therefore does not trigger individual inquiries into the appropriateness of the fees.

RESPA provides in relevant part:

(a) No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

(b) No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the

rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed. 12 U.S.C. § 2607(a) & (b) (1994). Because kickbacks are prohibited by subsection (a) and plaintiffs allege that Conway and his family received kickbacks, common questions of law and fact predominate.

Additionally, the defendants argue that individual issues will predominate here because the RICO claims of many of the putative class members are time-barred under the Supreme Court's decision in *Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). The *Rotella* Court, in reviewing the timeliness of a claim brought by a man who allegedly had been wrongfully admitted, treated, and retained at a psychiatric facility, rejected the argument that the four year statute of limitations period in a civil RICO action begins to run when a plaintiff discovers or should discover his injury and a pattern of RICO activity. *Id.,* 120 S.Ct. at 1079–82. Among other things, a pattern of discovery rule would offend the policies which underpin statutes of limitations: "repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Id.,* 120 S.Ct. at 1081. In so holding, however, the Court expressly noted that equitable principles of tolling still apply to the statute of limitations. *Id.,* 120 S.Ct. at 1084.

Plaintiffs argue that the statute of limitations begins to run when the injury—the discovery of the fraud—occurred. Their argument fails. The Supreme Court expressly rejected a theory under which the clock started at the discovery of the pattern of RICO activity. However, the principles of equitable tolling save the plaintiffs' claims here and therefore preclude a denial of their motion for class certification because the plaintiffs have made a showing of fraudulent concealment. This Court visited the issue of equitable tolling in its Memorandum and Or-

der of November 15, 1999, and found that this scheme was "self concealing," and therefore, the limitations period was tolled until March 3, 1994, when the OTS report was filed and the plaintiffs learned of the fraud. *Weil v. LISB,* 77 F.Supp.2d 313, 326 (E.D.N.Y.1999). There is no good and valid reason to revisit that finding now. Moreover, the crucial question here is whether the defendants have concealed the nature of this scheme. This question is common to all members of the class. Therefore, individual questions of due diligence do not predominate. *See In re Flat Glass Antitrust Litig.,* 191 F.R.D. 472, 487–88 (W.D.Pa.1999) (noting that "the issue of the fact of concealment is the predominating question, even though other individual questions are present, because the inquiry necessarily focuses on defendants' conduct, that is, what defendants did, rather than what plaintiffs did").

The defendants also argue that individual questions of reliance predominate here because the HUD guide given to plaintiffs in 1987 defined the term "controlled business arrangements" although the bank had used the term "business relationship" in its RESPA disclosure statements. The plaintiffs correctly maintain that this argument is a red herring. It matters not whether there was a minor deviation in the forms given to the plaintiffs when the nature of Conway's relationship with the law firm was not disclosed.

The defendants also argue that the degree of reliance among class members differs here. They point to, among other things, Amrod's testimony that, notwithstanding his advice that LISB's legal fees were higher than other banks, some clients still took out mortgages from LISB.

Admittedly, there are individual questions of reliance here. However, the crucial issue is whether these questions of reliance predominate. Generally, reliance issues do not predominate, as the focus in this inquiry is on the common question of liability. *See Walsh v. Northrop Grumman Corp.,* 162 F.R.D. 440, 446 (E.D.N.Y.1995).[4]

---

4. The defendants note that this case may be distinguished from *Walsh v. Northrop Grumman Corp.,* 162 F.R.D. 440 (E.D.N.Y.1995) because LISB's representations to the class members var-

ied. According to the plaintiffs, however, whose allegations at this point should be accepted as true, there were no material differences in the representations.

Common issues of law and fact predominate here because plaintiffs allege that each potential class member was defrauded by the same scheme. Therefore, the defendants' argument that some of the potential plaintiffs may have negotiated lower legal fees will not defeat class certification. This issue, which relates primarily to damages, does not render the class action valueless.

Finally, a class action is the best way to address the claims presented in this action. There are potentially thousands of plaintiffs here, and each of these plaintiffs may have claims which are worth less than one thousand dollars.

### 6. The Class Period

The defendants also argue that the plaintiffs have not adequately defined a class period. They claim that Conway resigned from the law firm in December 1989 and that his daughter, Susan Conway Petrelli, and his daughter-in-law, Denise Whelan, resigned from the firm in December 1990 and that therefore after 1990, no member of the family received compensation. As the plaintiffs correctly note, a Court may modify a class as the litigation progresses. *See Woe v. Cuomo*, 729 F.2d 96, 107 (2d Cir.1984). At this point, plaintiffs have adequately alleged that the fraud continued through December 1992.

### CONCLUSION

This Court has examined the defendants' remaining arguments and finds them to be without merit. Accordingly, for the reasons stated above, the motion for class certification is granted.

SO ORDERED.